**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| **AMANDA WHATLEY, individually and on behalf of all others similarly situated,** | : | |
| **Plaintiff,** | : | **CASE NO:** |
| **vs.** | : | **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| **SOUTHCOAST MEDICAL GROUP, LLC, and PRIVIA MEDICAL GROUP OF GEORGIA, LLC,** | : | |
| **Defendants.** | : | |

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff Amanda Whatley ("Plaintiff") brings this Class Action Complaint against Defendant SouthCoast Medical Group, LLC ("SouthCoast Health") and Defendant Privia Medical Group of Georgia, LLC ("Privia") (collectively, "Defendants"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to her own actions and her counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. On June 18, 2023, Defendants learned that unauthorized persons had accessed their network. In the ensuing days, Defendants discovered that the most sensitive personal health information belonging to tens of thousands of Defendants' patients, including Plaintiff and the Class Members, had been exposed and obtained in a data breach. The information exposed and obtained by the attackers included Plaintiff's and the Class Members' Social Security numbers,

dates of birth, names, copies of birth certificates, copies of marriage certificates, financial account information, payment card information, passport numbers, driver's license numbers, vehicle license plate numbers, state identification numbers, military identification numbers, taxpayer identification numbers ("Personally Identifiably Information" or "PII") and health insurance information and medical information (collectively, "Protected Health Information" or "PHI").[1]

2. Approximately one year later, on July 3, 2024, Defendants sent a notice to Plaintiff and the Class Members, notifying them, for the first time, of the breach.

3. Defendants did not explain why they waited over a year to notify Plaintiff and the Class Members that Defendants' network had been breached and that Plaintiff's and Class Members' Private Information had been accessed over twelve months earlier and was in the possession of unknown third parties.

4. Plaintiff brings this class action against Defendants for their failure to secure and safeguard Plaintiff's and Class Members' highly sensitive Private Information from unauthorized disclosure, exfiltration, and theft by third parties, and for their failure to timely and accurately notify Plaintiff and Class Members of the data breach.

5. Due to Defendants' inadequate data security, which breached duties imposed by law, unauthorized third parties gained access to Defendants' computer network and to highly valuable and highly sensitive Private Information belonging to Plaintiff and the Class Members.

6. Defendant SouthCoast Health is a healthcare provider that provides "Total Wellness" and coordinates care across an integrated network of 120 physicians and medical professionals.[2]

---

[1] This Complaint refers to PII and PHI collectively as "Private Information."
[2] https://www.southcoasthealth.com/about-sch/about (last visited July 25, 2024).

7. Defendant Privia is a Georgia Health Care Group that partners with private practice providers to help run their practices.[3]

8. In the course of providing care and treatment services to patients across the Southeast, Defendants regularly acquired, collected, utilized, and derived a benefit from Plaintiff's and Class Members' PII and PHI. The PII at issues includes, but is not limited to, Plaintiff's and Class Members' Social Security numbers, dates of birth, names, copies of birth certificates, copies of marriage certificates, financial account information, payment card information, passport numbers, driver's license numbers, vehicle license plate numbers, state identification numbers, military identification numbers, taxpayer identification numbers. The PHI at issue includes, but is not limited to, Plaintiff's and Class Members' health insurance information and medical information.

9. As a condition of receiving care and treatment services, Defendants require that their patients entrust them with PII and PHI.

10. As healthcare providers that collect and store patients' Private Information, Defendants have statutory, regulatory, and common law duties to safeguard that information and ensure that it remains private, confidential, and protected against foreseeable criminal activity, and to timely and accurately notify patients of breaches compromising their PII and PHI. Defendants breached their statutory, regulatory, and common law duties as discussed herein.

11. A physician-patient relationship is a classic confidential and fiduciary relationship. "Confidential relations" are defined in Ga. Code Ann. § 23-2-58:

> Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith,

[3] https://www.priviahealth.com/what-we-offer/why-privia/ (last visited July 25, 2024).

> such as the relationship between partners; principal and agent; guardian or conservator and minor or ward; personal representative or temporary administrator and heir, legatee, devisee, or beneficiary; trustee and beneficiary; and similar fiduciary relationships.

12. Defendants expressly and impliedly promised Plaintiff and Class Members that they would maintain the privacy and confidentiality of their PII and PHI. Defendants, as part of the medical services provided to Plaintiff and Class Members, promised not to disclose their PHI without authorization. Plaintiff and Class Members reasonably expected that their Private Information that they entrusted to Defendants, as part of their medical treatments, would remain confidential and would not be shared or disclosed to criminal third parties. The express and/or implied promises included an understanding that Defendants would take steps to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect patients' PII and PHI. Defendants breached these duties by failing to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect patients' PII and PHI.

13. On July 3, 2024, Defendants notified Plaintiff and Class Members via email of a "unauthorized activity within our network" that they "became aware of" on June 18, 2023 (hereafter, "Data Breach").

14. After learning of the cyberattack in June 2023, Defendants claim to have undertaken a comprehensive and time-consuming review. Defendants do not say what – if any – measures were taken to remediate their network.[4]

15. Defendants' email notice confirms that an "unauthorized actor gained access to our network and viewed or copied certain files stored on certain systems." Defendants noted that "SouthCoast Health's electronic medical record (EMR) systems were not impacted by this event."[5]

[4] https://www.southcoasthealth.com/notice-data-privacy-event (last visited July 25, 2024).
[5] *Id*.

16. Upon information and belief, and based on the plain language of Defendants' breach notice, Defendants improperly maintained patient PII and PHI, including "protected health information," "medical information," and "health insurance information" ***outside of its EMR systems***, in violation of statutory, regulatory, and common law duties and obligations.

17. Through the notice, Defendants confirmed that the "unauthorized actor" had in fact obtained and acquired PII and PHI in the first place.

18. Upon information and belief, the "unauthorized actor" who carried out the cyberattack are not honest brokers and were motivated to attack Defendants' system because of the valuable PII and PHI it holds from Plaintiff and the other Class Members.

19. Upon information and belief, the "unauthorized actor" who carried out the cyberattack was motivated to steal Plaintiff's and the other Class members' PII and PHI both because of the value of data they stole from Defendants on the dark web and elsewhere.

20. Plaintiff brings this class action lawsuit on behalf of those similarly situated to address (1) Defendants' inadequate safeguarding of Plaintiff's and Class Members' PII and PHI that Defendants collected and maintained, and (2) Defendants' failure to provide timely and adequate notice to Plaintiff and other Class Members that their PII and PHI had been compromised in a cyberattack.

21. Plaintiff's and Class Members' PII and PHI was compromised due to Defendants' negligent and/or careless acts and omissions and failure to protect the PII and PHI of Plaintiff and Class Members.

22. While many details of the Data Breach remain in the exclusive control of Defendants, upon information and belief, Defendants breached their duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and

maintain reasonable network safeguards against foreseeable cyber threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendants' inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents, and (10) failing to notify Plaintiff and Class Members in a timely and accurate manner so that they could mitigate the harm.

23. Defendants maintained Plaintiff's and the Class Members' PII and PHI in a negligent manner. In particular, the PII and PHI was maintained on computer systems and networks that were in a condition vulnerable to cyberattack. The mechanism of the Data Breach, and the potential for improper disclosure of Plaintiff's and Class Members' PII and PHI, was a known risk to Defendants; and, thus, Defendants were on notice that failing to take appropriate protective measures would expose and increase the risk that the PII and PHI could be compromised and stolen.

24. As a result of Defendants' unreasonable and inadequate data security practices that resulted in the Data Breach, Plaintiff and Class Members have now been exposed to a present injury in the form of actual misuse of their PII and PHI and have further been exposed to an ongoing substantial, heightened, and imminent risk of financial fraud and identity theft for years to come. Plaintiff and Class Members must now and in the future closely monitor their financial accounts, credit reports, and tax returns to secure their accounts in an effort to deter and detect

identity theft and fraud.

25. Because the exposed information included immutable personal details, Plaintiff and Class Members have suffered numerous actual and concrete injuries and damages that are personal, social, and financial, including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft including purchasing credit monitoring services, credit freezes and other protective measures; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their PII and PHI; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their PII and PHI, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII and PHI.

26. The PII and PHI of Plaintiff and Class Members are in the hands of hackers. Hackers routinely offer for sale the unencrypted, unredacted PII and PHI like that belonging to Plaintiff and Class Members that were compromised in the Data Breach. The exposed PII and PHI of Plaintiff and Class Members can, and likely will, be sold repeatedly on the dark web. This risk will continue for Plaintiff's and the Class Member's respective lifetimes.

27. Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose PII and PHI were accessed during the Data Breach. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, future costs of identity theft monitoring, and injunctive relief including improvements to Defendants'

data security systems, and future annual audits.

28. Accordingly, Plaintiff brings this action against Defendants seeking redress for its unlawful conduct and asserts claims for: (i) breach of fiduciary duty; (ii) negligence; (iii) negligence *per se*; (iv) invasion of privacy/intrusion upon seclusion; (v) bailment; and (vi) declaratory and injunctive relief.

**PARTIES**

29. Plaintiff Amanda Whatley is a citizen of Georgia residing in Effingham County, Georgia. Plaintiff received an email dated July 3, 2024, from Defendants notifying Plaintiff that Defendants' network had been breached and that Plaintiff's PII and PHI were compromised in the Data Breach.

30. Defendant SouthCoast Medical Group, LLC is a limited liability company organized under the laws of Georgia and headquartered in Savannah, Georgia. SouthCoast's principal place of business is located at 330 Benfield Dr., Savannah, GA 31406. Defendant can be served through its registered agent, Sue Hunnings, 330 Benfield Drive, Savannah, GA 31406. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who are members of the LLC and who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known, including the members of the LLC.

31. Defendant Privia Medical Group of Georgia, LLC is a limited liability company organized under the laws of Georgia. Privia's principal place of business is located at 950 N. Glebe Road, Suite 700, Arlington, VA 22203. Defendant can be served through its registered agent, National Registered Agents, Inc., 289 S. Culver Street, Lawrenceville, GA 30046. The true names

and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who are members of the LLC and who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known, including the members of the LLC.

32. Defendants are directly liable for their own acts, omissions, and negligence.[6]

## JURISDICTION AND VENUE

33. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, and there are more than 100 putative class members, and minimal diversity exists because, upon information and belief, Defendants and at least one Class Member are citizens of different States. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

34. This Court has personal jurisdiction over Defendants because they operate and are either headquartered in this District and/or conduct substantial business in this District.

35. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendant SouthCoast is based in this District, maintains Plaintiff's and Class Members' Private Information in this District, and has caused harm to Plaintiff and Class Members in this District.

[6] Whenever reference is made in this Complaint to any action, inaction, or conduct of the Defendants named in this Complaint, the allegation is that the Defendants engaged in the action, inaction, or conduct at issue by or through one or more of its officers, directors, agents, employees, or representatives who were engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## FACTUAL ALLEGATIONS

***Defendants Promised to Protect Plaintiff's and Class Members' Highly Sensitive PII and PHI***

36. Defendant SouthCoast touts that it is a healthcare provider that offers services "from pediatrics to geriatrics, from sore throats to surgery, from well visits to urgent care, and everything in between… With more than 120 healthcare professionals encompassing more than 20 specialties and services, we are committed to the health and wellness of the communities we serve across the Lowcountry and Coastal Empire of Georgia and South Carolina."[7]

37. Privia provides technology and management services to SouthCoast to support its workflow.[8]

38. The link to the Privacy Notice on Defendant Privia's website lands on Privia Health's HIPAA Privacy Notice.[9] In its HIPAA Privacy Notice, Defendant Privia makes numerous commitments to their patients to protect their information., representing that it is committed to patients' privacy and explaining how it will use and disclose Plaintiff's and Class Members' PHI.[10] Treating PHI responsibly necessarily includes protecting it from a data breach.

39. The link to the Privacy Notice on Defendant SouthCoast's website lands on its Notice of Privacy Practices where it provides a Pledge to Plaintiff and Class Members regarding their Medical Information, committing to protecting Plaintiff's and Class Members' information and maintaining the privacy and security of their information.[11] Treating PHI responsibly necessarily includes protecting it from a data breach.

40. Plaintiff and Class Members relied on Defendants' representations that they would

---

[7] https://www.southcoasthealth.com/ (last visited July 25, 2024).
[8] https://www.priviahealth.com/what-we-offer/our-solutions/ (last visited July 25, 2024).
[9] https://www.priviahealth.com/privacy-and-compliance (last visited July 25, 2024).
[10] *Id.*
[11] https://www.southcoast.org/privacy-practices/ (last visited July 25, 2024).

protect their personal and private health information.

41. As a prerequisite to receiving medical services from Defendants, Plaintiff provided her PII and PHI to Defendants and trusted that the information would be safeguarded according to state and federal law. Upon receipt, Plaintiff's PII and PHI was entered and stored on Defendants' network.

42. Plaintiff Whatley only allowed Defendants to maintain, store, and use her Private Information because she reasonably expected that Defendants would use basic security measures to protect her Private Information and prevent access by unauthorized third parties, such as requiring passwords and multi-factor authentication to access databases storing her Private Information, exercising appropriate managerial control over data security, and timely disclosing and patching any data security vulnerabilities.

43. Plaintiff is very careful about sharing her sensitive PII and PHI. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

44. Plaintiff stores any documents containing her sensitive Private Information in a safe and secure location or destroys the documents.

45. Had she known Defendants failed to follow basic industry security standards and failed to implement systems to protect her PII and PHI, she would not have provided that information to Defendants.

46. The notice letter dated July 3, 2024, from Defendants notified Plaintiff that Defendants' network had been accessed and that Plaintiff's PII and PHI stored on their systems was involved in the Data Breach.

47. In the instant that her Private Information was accessed and obtained by a third

party without her consent or authorization, Plaintiff Whatley suffered injury from a loss of privacy.

48. Furthermore, Defendants directed Plaintiff to be vigilant and to take certain steps to protect her Private Information and otherwise mitigate her damages.

49. As a result of the Data Breach, Plaintiff heeded Defendants' warning and spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the notice letter notifying her of the breach and self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendants' direction by way of the Data Breach notice where Defendants advised Plaintiff to mitigate her damages by, among other things, monitoring her accounts for fraudulent activity.

50. Even with the best response, the harm caused to Plaintiff cannot be undone.

51. Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's PII and PHI—a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and as a result of the Data Breach. This information has inherent value that Plaintiff Whatley was deprived of when her Private Information was negligently made accessible to and intentionally and maliciously exfiltrated by cybercriminals.

52. She also lost her benefit of the bargain by paying for medical services that failed to provide the data security that was promised.

53. Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

54. Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from her PII and PHI being in the hands of unauthorized third parties and criminals.

55. Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

56. Plaintiff has a continuing interest in ensuring that Plaintiff's PII and PHI, which, upon information and belief, remains backed up in Defendants' possession, is protected, and safeguarded from future breaches.

***The Data Breach was Foreseeable, and Defendants Should Have Foreseen the Risk of a Data Breach Involving Plaintiff's and the Class Members' PII and PHI***

57. The injuries to Plaintiff and Class Members were reasonably foreseeable to Defendants because common law, statutes, and industry standards required Defendants to safeguard their computer systems and employ reasonable procedures and controls to ensure that unauthorized third parties did not gain access to Plaintiff's and the other Class Members' highly sensitive PII and PHI.

58. Defendants were obligated to perform their business operations in accordance with industry standards. Industry standards required Defendants to exercise reasonable care with respect to Plaintiff and the Class Members by implementing reasonable data security measures to mitigate foreseeable risk of harm to Plaintiff and the Class Members. Industry standards put the onus of adequate cybersecurity on the entity most capable of preventing a Data Breach. In this case, Defendants were the only entities responsible for adequately protecting Plaintiff's and the Class Members' data that Defendants alone solicited, collected, and stored.

59. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII and PHI of Plaintiff and Class Members and the risk of a data breach. Further, Defendants knew, or reasonably should have known, of the consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

60. In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020. Of the 1,862 recorded data breaches, 330 of them, or 17.7% were in the medical or healthcare industry.[12] The 330 reported breaches in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

61. The healthcare industry continues to be a popular target for threat actors, which is why the United States Department of Health and Human Services ("HHS") and other regulators have extensively focused on ensuring health care providers protect patient personal and health information. The last several years have seen multiple, high-profile health care breaches, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020).

62. Indeed, cyberattacks have become so common and notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued warnings to potential targets so they are aware of, and prepared for, a foreseeable attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[13]

63. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare

---

[12] *See 2021 Data Breach Annual Report*, 6 (ITRC, Jan. 2022), https://notified.idtheftcenter.org/s/

[13] FBI, *Secret Service Warn of Targeted*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbisecret-service-warn-of-targeted- ransomware

organizations experienced cyberattacks in the past year.[14]

64. Defendants knew or should have known that a data breach was reasonably foreseeable because the PII and PHI they store for Plaintiff and Class Members is of high value to criminals. Indeed, the value of health information is considerably higher than the value of ordinary personal information, including credit cards. The FBI found that "[c]yber criminals are selling [health] information on the black market at a rate of $50 for each partial [electronic health record], compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft."[15] *Forbes* reported in 2022 that the costs are now as high as $1000 per health record.[16]

65. As detailed below, because of the variety of harms threat actors can inflict with both PII and PHI, PII and PHI are highly valuable to threat actors.

66. Given the frequency of cyberattacks in the healthcare industry, as well as the high value of PII and PHI, cybersecurity attacks were foreseeable to Defendants and should have been expected. The attendant risk of future attacks was widely known to Defendants.

***Defendants' Data Breach and Defendants' Notice of Data Breach to Plaintiff and the Class Members***

67. Plaintiff received an notice letter dated July 3, 2024 titled "NOTICE OF SECURITY INCIDENT."[17] According to this letter and a separate breach notification posting by

---

[14] *See* Maria Hernandez, *Iowa City Hospital Suffers Phishing Attack*, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988- iowa-city-hospital-suffers-phishing-attack.

[15] Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, 2 (Apr. 8, 2014), https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf

[16] Sanjay Cherian, *Healthcare Data: The Perfect Storm*, Forbes (Jan. 14, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/01/14/healthcare-data-the-perfect-storm/?sh=428f6a36c887

[17] https://www.southcoasthealth.com/notice-data-privacy-event (last visited July 25, 2024).

Defendants on their websites, Defendants identified "unauthorized activity within our network" and explained that between June 15 – June 18, 2023, an unauthorized actor gained access to our network and viewed or copied certain files stored non certain systems."[18] Defendants claim that they "promptly took steps to secure our systems and investigate the nature and scope of the event with assistance from third-party forensic specialists."[19]

68. Defendants' Notice of Data Breach admits that Defendants' systems were accessed without authorization and that Plaintiff's and the Class Members' PII and PHI were compromised and exfiltrated by the threat actor, indicating that this was a targeted attack designed to acquire Plaintiff's and Class Members' Private Information.[20]

69. According to Defendants, the threat actor (or, as Defendants blandly identify them, the "unauthorized actor") behind the attack were able to access files that held documents containing a wide variety of highly sensitive information, including patients' Social Security numbers, dates of birth, names, copies of birth certificates, copies of marriage certificates, financial account information, payment card information, passport numbers, driver's license numbers, vehicle license plate numbers, state identification numbers, military identification numbers, taxpayer identification numbers, medical information, and health information.

70. Neither the Plaintiff nor the Class Members whose information was accessed or taken by the threat actor authorized or consented to the threat actor accessing or acquiring their PII and PHI from Defendants' systems.

71. Defendants claim in their notice to Plaintiff that "we have no indication of identity theft or fraud in relation to this incident,"[21] but this statement is at odds with the threat actors'

---

[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*

cyberattack, and it misleads Plaintiff and Class Members as to the risks to their data.

72. Class Members are left to reasonably conclude that their Private Information has been stolen by the threat actor, and remains in their possession for misuse, including for perpetrating identity theft and fraud.

73. Defendants' breach notification and letter raise additional questions about where Defendants store patient data within their network. Defendants acknowledge that patient PHI was accessed by the threat actors and taken. Yet, Defendants' notice to Plaintiff states that "SouthCoast Health's electronic medical record (EMR) systems were not impacted by this event."[22] Defendants' statement admits that patient information resided *outside* of the supposedly secure EMR systems, which violates HIPAA[23] and industry standards, and is a grossly negligent data practice.

***When Defendants Discovered the Breach vs. When They Told Patients About It***

74. The HIPAA Breach Notification Rule has stringent requirements for health care providers to promptly notify affected patients: "A covered entity ***shall***, following the discovery of a breach of unsecured protected health information, ***notify each individual*** whose unsecured protected health information has been, or is reasonably believed by the covered entity to have been, accessed, acquired, used, or disclosed as a result of such breach."[24] Such notice is to be provided "without unreasonable delay and in no case later than 60 calendar days after discovery of a

[22] *Id.*
[23] *See* 45 C.F.R. §§ 164.308, 164.310, 164.312, 164.314, 164.316 & 164.530; *see also* Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, 42 U.S.C. § 1320d-2 (1996); U.S. Department of Health and Human Services, *Summary of the HIPAA Security Rule*, https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html (last visited July 25, 2024).
[24] HIPAA Breach Notification Rule, 45 C.F.R. § 164.404(a)(1) (2013) (emphasis added).

breach."[25]

75. In addition to requiring Defendants to notify affected patients, the HIPAA Breach Notification Rule also required Defendants to notify the Secretary of the United States Department of Health and Human Services ("HHS") "following the discovery of a breach of unsecured protected health information[.]"[26]

76. Here, because the Data Breach involved more than 500 individuals, Defendants were required to notify HHS "contemporaneously with the notice required by § 164.404(a) and in the manner specified on the HHS Web site."[27] In other words, Defendants were required to simultaneously notify ***both*** HHS ***and*** Plaintiff and the Class Members within 60 days of discovery of the breach.

77. Defendants claim they discovered the breach on June 18, 2023.

78. But Defendants did not notify Plaintiff and the Class Members within 60 days as required by HHS. Instead, Plaintiff and the Class Members were not notified of the Data Breach until July 3, 2024—over twelve months after Defendants discovered the Data Breach. Defendants' year-long delay is inexcusable, and Defendants failed to promptly notify Plaintiff and the Class Members.

79. In addition to legal notification obligations arising under HIPAA, Defendants also had an ethical obligation to promptly notify their patients. According to the American Medical Association ("AMA"):

> When there is reason to believe that patients' confidentiality has been compromised by a breach of the electronic medical record, physicians should:
>
> (a) Ensure that patients are promptly informed about the breach and

---

[25] HIPAA Breach Notification Rule, 45 C.F.R. § 164.404(b) (2013).
[26] HIPAA Breach Notification Rule, 45 C.F.R. § 164.408(a) (2013).
[27] HIPAA Breach Notification Rule, 45 C.F.R. § 164.408(b) (2013).

> potential for harm, either by disclosing directly (when the physician has administrative responsibility for the EMR), participating in efforts by the practice or health care institution to disclose, or ensuring that the practice or institution takes appropriate action to disclose."[28]

80. Further, the AMA states that:

> Physicians have a responsibility to follow ethically appropriate procedures for disclosure, which should at minimum include:
>
> (c) Carrying out the disclosure confidentially and within a time frame that provides patients ample opportunity to take steps to minimize potential adverse consequences.
>
> (d) Describing what information was breached; how the breach happened; what the consequences may be; what corrective actions have been taken by the physician, practice, or institution; and what steps patients themselves might take to minimize adverse consequences.[29]

81. Defendants violated not just their legal obligations under the HIPAA Breach Notification Rule, but also their ethical obligations.

82. Further, Defendants violated their own HIPAA Privacy Notice by allowing unauthorized actors access to Plaintiff's and Class Members' Private Information.

83. Defendants' late notification amplifies the harms, detailed in the sections below, that Defendants have caused Plaintiff and the Class Members through their negligent keeping of their PII and PHI.

84. By waiting to disclose the Data Breach and downplaying the risk that victims' PHI and PII would be misused by criminals, Defendants prevented victims from taking timely and proactive mitigation measures to protect themselves from harm.

---

[28] AMA Code of Medical Ethics, Opinion 3.3.3 Breach of Security in Electronic Medical Records, American Medical Association, https://code-medical-ethics.ama-assn.org/ethics-opinions/breach-security-electronic-medical-records (last visited July 25, 2024).
[29] *Id.*

85. Defendants' notification letter included "Steps You Can Take to Help Protect Personal Information." Defendants offered theft protection services for 12 months but refused to automatically enroll Plaintiff and Class Members to protect them from the harm Defendants' negligence caused them.

86. Unfortunately, as the Government Accountability Office ("GAO") has observed in their research, "[c]onsumers have limited options to mitigate risks of other harms from data breaches, such as medical identity theft and identity theft tax refund fraud. Commercial identity theft services, credit freezes, and fraud alerts do not directly address these risks."[30]

***Defendants Violated HIPAA Security Rule Requirements***

87. Defendants' HIPAA violations extend beyond their untimely Data Breach notification. Health care providers subject to HIPAA, such as Defendants, are required to comply with and implement a number of security controls and safeguards to protect patient health information. Defendants did not do so.

88. Because PHI is so important, the first standard in the HIPAA Security Rule requires healthcare providers to safeguard it:

> Covered entities and business associates must do the following: (1) Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits. (2) Protect against any reasonably anticipated threats or hazards to the security or integrity of such information. (3) Protect against any reasonably anticipated uses or disclosures of such information that are not permitted or required under subpart E of this part. (4) Ensure compliance with this subpart by its workforce.[31]

---

[30] United States Government Accountability Office, Data Breaches: Range of Consumer Risks Highlights Limitations of Identity Theft Services, 13 (March 2019), https://www.gao.gov/assets/gao-19-230.pdf (last visited July 25, 2024).
[31] HIPAA Security Rule, 45 C.F.R. § 164.306(a) (2013).

89. Given the frequency, likelihood, and cost of cyber- attacks, Defendants knew or should have known that a cyber-attack was foreseeable. Further, Defendants' security controls and safeguards should have been designed to defend against exactly this type of attack.

90. Defendants should have deployed systems controls like encryption,[32] an "addressable" requirement set forth in the HIPAA Security Rule, and rendered patient health information unreadable to an attacker. Defendants did not do so.

91. The HIPAA Security Rule also requires covered entities to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights as specified in §164.308(a)(4)."[33]

92. Defendants' notice letter about the Data Breach states that the unauthorized actor viewed or copied certain files stored on certain systems—Plaintiff's and the Class Members' sacrosanct Private Information—evidencing Defendants' failure to adequately implement this HIPAA requirement.

93. HIPAA requires other protections for access to health information. Covered entities must "[i]mplement procedures to verify that a person or entity seeking access to electronic protected health information is the one claimed."[34]

94. The threat actor's ability to move around Defendants' system and access patient data demonstrates that Defendants also failed to satisfy this requirement.

95. The above are representative examples of Defendants' failure to meet their HIPAA

[32] Defendants' July 3, 2024 notice letter did not disclose that the data obtained was encrypted; thus, the threat actors had access to unencrypted patient data. This is inexcusable given the extreme sensitivity of the data Defendants put at risk.
[33] HIPAA Security Rule, 45 C.F.R. § 164.312(a)(1) (2013).
[34] HIPAA Security Rule, 45 C.F.R. § 164.312(d) (2013).

Security Rule obligations.

***Defendants Failed to Meet Basic Industry Standard Security Requirements***

96. In addition to its multiple HIPAA Security Rule failings, Defendants also had a duty to implement reasonable security measures to protect the highly sensitive personal and health information of its patients. Defendants' duty correlates with the sensitivity of the data in Defendants' possession and control. In this case, Defendants' patients' data was perhaps the most sensitive data imaginable.

97. Further, Defendants are not a small one- or two-person clinic, but rather a large health group with ample resources to adequately protect their patients' data. Defendants' security obligations are far higher than the security Defendants implemented.

98. Numerous organizations, such as the Federal Trade Commission ("FTC"), the United States Cybersecurity and Infrastructure Security Agency ("CISA"), and the National Institute of Standards and Technology ("NIST") have defined the security controls and safeguards companies like Defendants must implement to protect consumer information.

99. The FTC, for example, in its "Cybersecurity Basics" document, sets forth fundamental data security principles and practices. Among them: companies should encrypt devices and other media that contain sensitive personal information.[35] The FTC says such encryption should be used on "laptops, tablets, smartphones, removable drives, backup tapes, and cloud storage solutions."[36] Further, the FTC states that companies should update their software, secure files, require passwords, use multi-factor authentication, secure routers, use WPA2 or WPA3 encryption, require strong passwords, train staff and generally have a plan for security.[37]

[35] FTC, *Cybersecurity Basics*, https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/basics (last visited July 25, 2024).
[36] *Id.*
[37] *Id.*

The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[38]

100. Defendants could and should have implemented all of the above measures recommended by the FTC to prevent and detect cyberattacks. But, Defendants failed to implement one or more of the industry standard FTC recommendations.

101. To prevent and detect ransomware attacks, like Defendants experienced, CISA in its #StopRansomware Guide recommends that companies like Defendants implement the following measures:

- Do not expose services, such as remote desktop protocol, on the web;
- Conduct regular vulnerability scanning to identify and address vulnerabilities;
- Regularly patch and update software and operating systems to the latest available versions;
- Ensure all on-premises, cloud services, mobile, and personal (i.e., bring your own device [BYOD]) devices are properly configured and security features are enabled;
- Limit the use of RDP and other remote desktop services;
- Implement phishing-resistant MFA for all services;
- Implement identity and access management (IAM) systems;
- Change default admin usernames and passwords;
- Do not use root access accounts for day-to-day operations; and
- Store passwords in a secured database and use strong hashing algorithms.[39]

---

[38] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited July 25, 2024).
[39] CISA, #StopRansomware Guide, https://www.cisa.gov/stopransomware/ransomware-guide (last visited July 25, 2024).

102. Defendants could and should have implemented all of the above measures recommended by CISA to prevent and detect cyberattacks. But Defendants failed to implement one or more of the industry standard CISA recommendations.

103. In addition, to prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, the Microsoft Threat Protection Intelligence Team recommends the following measures:

**Secure internet-facing assets**

- Apply latest security updates;
- Use threat and vulnerability management;
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities;
- Hunt for brute force attempts;
- Monitor for cleanup of Event Logs;
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall;
- Enable tamper protection;
- Enable cloud-delivered protection;
- Turn on attack surface reduction rules and [Antimalware Scan Interface ("ASMI")] for Office [Visual Basic for Applications ("VBA")].[40]

104. Because Defendants failed to properly protect and safeguard Plaintiff's and Class Members' PII and PHI by failing to implement one or more of the foregoing industry standard data security measures recommended by the FTC, CISA, and the Microsoft Threat Protection Intelligence Team, an unauthorized third party was able to access Defendants' network and patient data.

***Defendants Negligently Failed to Protect Plaintiff's and Class Members' PII and PHI in Violation of Defendants' Duties and, Therefore, Caused the Data Breach***

105. Defendants assumed and owed duties and obligations to Plaintiff and Class Members to take reasonable measures to maintain and protect the PII and PHI that they regularly undertook to collect and store as part of their routine business operations.

106. Defendants breached their duties and obligations to Plaintiff and Class Members, and was negligent, because they failed to properly implement data security controls and safeguards that would adequately safeguard Plaintiff's and Class Members' PII and PHI. Defendants' unlawful conduct included, but is not limited to, one or more of the following acts and/or omissions:

a. Failing to design and maintain adequate data security controls and safeguards to reduce the risk of data breaches and protect Plaintiff's and Class Members information;

[40] https://www.microsoft.com/en-us/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited July 25, 2024).

b. Failing to properly monitor its data security systems for data security vulnerabilities and risk;

c. Failing to test and assess the adequacy of its data security controls and safeguards;

d. Failing to develop adequate training programs related to the proper handling of emails and email security practices;

e. Failing to implement uniform procedures and data security protections;

f. Failing to maintain its patients' information solely in designated systems with the appropriate level of cybersecurity protections;

g. Failing to adequately fund and allocate resources for the adequate design, operation, maintenance, and updating necessary to meet industry standards for data security protection;

h. Failing to ensure or otherwise require that it was compliant with HIPAA, FTC guidelines for cybersecurity, and other industry standards and best practices;

i. Failing to implement or update antivirus, endpoint detection and response software, and other intrusion detection and malware protection software;

j. Failing to implement encryption or adequate encryption to protect its systems and patients' data, both while the data is at rest and while being transmitted; and

k. Otherwise negligently and unlawfully failing to safeguard Plaintiff's and Class Members' information, which in turn allowed the threat actors to access and obtain such information.

107. Defendants failed to maintain reasonable and required security controls and safeguards for Plaintiff's and Class Members' PII and PHI.

108. Defendants could have prevented this Data Breach by properly securing and encrypting the systems containing the information of Plaintiff and Class Members.

109. Defendants' negligence in safeguarding the information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendants

to protect and secure sensitive data they possess.

110. Despite the foreseeability of the Data Breach, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised, and those failures resulted in the Data Breach.

***Background on the Harms that Victims of a Data Breach Suffer: Identity Theft and Financial Fraud, Medical Identity Theft, Out-of-Pocket Expenses, Lost Time, Worry, Stress, Humiliation, Shame, Loss of Trust in Healthcare System, and More***

Identity Theft and Financial Fraud

111. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal personal and health information to monetize the information.

112. Criminals regularly monetize stolen data by selling it on the black market to other criminals who then commit a variety of identity theft related crimes, such as those discussed below. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

113. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security Number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

114. A sophisticated black market exists on the dark web where criminals can buy or

sell personal and health information, like the information at issue in this case.[41] The digital character of personal information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity.[42] Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and health information.[43] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[44]

115. According to the GAO, regardless of how the data breach occurs, "[o]nce exposed, individuals' information can be misused to commit identity theft, fraud, or inflict other types of harm."[45]

116. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[46]

---

[41] The dark web is an unindexed layer of the internet that requires special software or authentication to access. What is the Dark Web? – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited July 25, 2024).

[42] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion. This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know. What Is the Dark Web?, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited July 25, 2024).

[43] *Id.*

[44] What is the Dark Web? – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited July 25, 2024).

[45] United States Government Accountability Office, *Data Breaches: Range of Consumer Risks Highlights Limitations of Identity Theft Services*, 4 (March 2019), https://www.gao.gov/assets/gao-19-230.pdf (last visited July 25, 2024).

[46] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 25, 2024).

Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[47] Defendants did not rapidly report to Plaintiff and the Class Members that their information had been stolen.

117. Identity theft is not a speculative or unlikely occurrence. Indeed, the GAO noted that "[i]n 2016, according to the Bureau of Justice Statistics, an estimated 26 million people – 10 percent of U.S. residents aged 16 or older – reported that they had been victims of identity theft in the previous year."[48]

118. Victims of a data breach have a high degree of likelihood of being victims of identity theft. A January 2024 report by the U.S. Department of Justice Bureau of Justice Statistics reports "[v]ictims of identity theft [] were twice as likely as nonvictims [] to learn that an entity with their personal information experienced a data breach in the past year."[49]

119. The types of identity theft that may occur vary. The GAO described the following types of common identity theft:

- Financial fraud from identity theft, which can include
    - new-account fraud, in which thieves use identifying data, such as Social Security and driver's license numbers, to open new financial accounts without that person's knowledge; and,
    - existing-account fraud, which is more common and entails the use or takeover of existing accounts, such as credit or debit card accounts, to make unauthorized charges or withdraw money.

[47] *Id.*
[48] *Id.*
[49] U.S. Department of Justice Bureau of Justice Statistics, *Just the Stats: Data Breach Notifications and Identity Theft, 2021*, (January 2024), https://bjs.ojp.gov/data-breach-notifications-and-identity-theft-2021 (last visited July 25, 2024).

- Tax refund fraud, which occurs when a Social Security number or other personally identifiable information is used to file a fraudulent tax return seeking a refund.

- Government benefits fraud, which occurs when thieves use stolen personal information to fraudulently obtain government benefits. For example, the Social Security Administration has reported that personal information of beneficiaries has been used to fraudulently redirect the beneficiary's direct deposit benefits.

- Medical identity theft, which occurs when someone uses an individual's name or personal identifying information to obtain medical services or prescription drugs fraudulently, including submitting fraudulent insurance claims.

- Synthetic identity theft, which involves the creation of a fictitious identity, typically by using a combination of real data and fabricated information. The federal government has identified synthetic identity theft as an emerging trend.

- Child identity theft, which occurs when a child's Social Security number or other identifying information is stolen and used to commit fraudulent activity.

- Other types of fraud that occur when personal information is used; for example, to set up mobile phone or utility accounts, or to engage in activities such as applying for employment or renting a home.[50]

120. The U.S. Federal Trade Commission ("FTC") has also reported that:

> "[o]nce identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance. An identity thief can file a tax refund in your name and get your refund. In some extreme cases, a thief might even give your name to the police during an arrest."[51]

121. Social Security numbers, for example, are among the worst kind of personal

---

[50] United States Government Accountability Office, Data Breaches: Range of Consumer Risks Highlights Limitations of Identity Theft Services, 5-6 (March 2019), https://www.gao.gov/assets/gao-19-230.pdf (last visited July 25, 2024).
[51] Federal Trade Commission, Warning Signs of Identity Theft, https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft (last visited July 25, 2024).

information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.

122. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.[52]

123. Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old [threat] information is quickly inherited into the new Social Security number."[53] Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security

---

[52] Social Security Administration, Identity Theft and Your Social Security Number, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 25, 2024).
[53] Brian Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen- by-anthem-s-hackers-has-millions-worrying-about-identity-theft (July 25, 2024).

number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[54]

Medical Identity Theft

124. The theft of health information is so uniquely harmful that the first standard in the HIPAA Security Rule requires health care providers to secure protected health information.

125. While health information can be used by threat actors for the types of identity theft described above by GAO, "medical identity theft" raises special risks.

126. In a World Privacy Forum report, medical identity theft was described as follows:

> Medical identity theft occurs when someone uses a person's name and sometimes other parts of their identity — such as insurance information — without the person's knowledge or consent to obtain medical services or goods, or uses the person's identity information to make false claims for medical services or goods. Medical identity theft frequently results in erroneous entries being put into existing medical records, and can involve the creation of fictitious medical records in the victim's name.[55]

127. The FTC has a similar definition: "Medical identity theft is when someone uses your personal information — like your name, Social Security number, health insurance account number or Medicare number — to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[56] "If the thief's health information

---

[54] Identity Theft and Your Social Security Number, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 25, 2024).
[55] Pam Dixon and John Emerson, *The Geography of Medical Identity Theft*, World Privacy Forum, 6 (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.
[56] Federal Trade Commission, *What to Know About Medical Identity Theft*, https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited July 25, 2024).

is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[57]

128. Victims of medical identity theft experience several harms, such as:

- "Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can then affect the healthcare a person receives if the errors are not caught and corrected."

- "Significant bills for medical goods and services they neither sought nor received."

- "Issues with insurance, co-pays, and insurance caps."

- "Long-term credit problems based on problems with debt collectors reporting debt due to identity theft."

- "Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime, in the aftermath of the crime."

- "Data gathered in the last 5 years and data analyzed for this report sheds new facts and light on the seriousness of debt collection problems for victims. Victims can experience long term problems with aggressive medical debt collection arising from debt that does not belong to them. As a result of improper or even potentially fraudulent medical debt reporting, some victims may not qualify for mortgage or other loans and may experience other financial impacts."

- "Phantom medical debt collection based on medical billing or other identity information is an additional modality of harm."

- "Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own."

---

[57] *Id.*

- "Victims still experience a general lack of ability to cure the full range of problems medical identity theft brings, even over the course of years for some victims."[58]

129. Complicating these harms is the fact that "[m]edical forms of identity theft are difficult to fix after the fact" and complications from identity theft can last for years.[59]

130. The harm from medical identity theft is enduring. The World Privacy Forum report observed that "[medical identity theft] can cause significant and often enduring harms to its victims, and it has left a trail of victims who have suffered deeply."[60] Indeed, the harms "develop over sometimes long periods of time. The consequences of medical identity theft still remain among the most severe of all identity crimes, and time has not lessened the severity of consequences victims may experience."[61]

Out-of-Pocket Expenses, Lost Time, Worry, Stress, Humiliation, Shame, Loss of Trust in Healthcare System, and More

131. Victims of a breach of their personal health information not only face harms like identity theft, medical identity theft, and financial fraud, but also out-of-pocket expenses, lost time, worry, stress, humiliation, shame, loss of trust in the healthcare system and providers, and more.

132. The President's Identity Theft Task Force released a report stating that in addition to the potentially thousands of dollars in out-of-pocket expenses incurred by victims of a data breach, victims "have to spend what can be a considerable amount of time to repair the damage

---

[58] Pam Dixon and John Emerson, The Geography of Medical Identity Theft, World Privacy Forum, 6-7 (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.
[59] *Id.*
[60] Pam Dixon and John Emerson, The Geography of Medical Identity Theft, World Privacy Forum, 6 (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.
[61] *Id.*

caused by the identity thieves."[62]

133. Indeed, victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

134. Because data thieves may wait years before attempting to use stolen data, Plaintiff and Class Members will need to remain vigilant for years to come.

135. Where the personal health information compromised in a data breach concerns highly sensitive medical history, treatment, and diagnostic materials—like it does here—the embarrassment, humiliation, worry, and risk of blackmail increases.[63] The AMA has found that "when a security breach occurs, patients may face physical, emotional, and dignitary harms."[64]

136. Further, data breaches erode trust patients have in their doctors. If a patient must worry that their doctor will have a data breach and their sensitive health information may be publicly exposed, the patient may hold back on sharing vital health information with their doctor. In response to this concern, AMA's "Privacy Principles" state: "[a]bove all, patients must feel confident that their health information will remain private. Preserving patient trust is critical."[65]

---

[62] The President's Identity Theft Task Force, *Combating Identity Theft: A Strategic Plan*, 11 (April 2007), https://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf (last visited July 25, 2024) ("Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.").

[63] *See, e.g.*, Charles Ornstein, Small-Scale Violations of Medical Privacy Often Cause the Most Harm, ProPublica, (Dec. 10, 2015), https://www.propublica.org/article/small-scale-violations-of-medical-privacy-often-cause-the-most-harm.

[64] AMA Code of Medical Ethics, Opinion 3.3.3 Breach of Security in Electronic Medical Records, American Medical Association, https://code-medical-ethics.ama-assn.org/ethics-opinions/breach-security-electronic-medical-records (last visited July 25, 2024)..

[65] *See* Robert J. Mills, *AMA Issues New Principles to Restore Trust in Data Privacy*, Press Release Point (May 11, 2020), https://www.pressreleasepoint.com/ama-issues-new-principles-

**COMMON INJURIES & DAMAGES**

137. As result of Defendants' inadequate data security, Plaintiff and Class Members now face significant harms, including identity theft, medical identity theft, fraud, out-of-pocket expenses, lost time, worry, stress, humiliation, shame, loss of trust in the healthcare system, and more.

138. Due to the foreseeable Data Breach, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their personal and health information; and (i) the continued risk to their personal and health information, which remains in Defendants' possession, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' information.

139. Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, a reasonable person is expected to take steps and spend time learning about the breach and mitigating the risks of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater harm—yet,

restore-trust-data-privacy; American Medical Association, *AMA Privacy Principles*, (May 2020), https://www.ama-assn.org/system/files/2020-05/privacy-principles.pdf.

the resource and asset of time is lost.

140. Defendants' notice letter regarding the Data Breach says that Plaintiff and Class Members should "remain vigilant by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors."

141. Likewise, the FTC recommends that data breach victims take certain steps after a breach, including: contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[66]

142. Because of the Data Breach, Plaintiff and Class Members have spent and will spend time in the future on a variety of prudent actions, such as reviewing and monitoring credit reports and accounts for unauthorized activity, placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, and filing police reports.

143. Plaintiff and Class Members bear a significant and costly burden to mitigate the harms they face due to Defendants' negligence in handling and securing their Private Information.

144. Even with Plaintiff and Class Members making their best efforts to mitigate the harms from Defendants' negligence, Plaintiff and Class Members are still at significant risk of identity theft because of the Data Breach.

145. In the event that Plaintiff and Class Members experience actual identity theft and fraud, a 2007 GAO Report regarding data breaches states that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

[66] *See* Federal Trade Commission, Identity Theft.gov, https://www.identitytheft.gov/Steps (last visited July 25, 2024).

146. A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information after a data breach:[67]




147. Separate and apart from harms related to identity theft and fraud, as a result of the Data Breach the monetary value of Plaintiff's and Class Members' Private Information has been diminished by its unauthorized acquisition by threat actors and release onto the dark web (where it may soon be available and holds significant value for the threat actors).[68] As with any product or commodity, the value of data is directly tied to its scarcity and usefulness. Because of the Data Breach, Plaintiff's and Class Member's PII and PHI is now more readily available (potentially on the dark web) and is less valuable.

[67] "Credit Card and ID Theft Statistics" by Jason Steele, 06/11/2021, at https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/.

[68] Private Information, like that at issue here, is currency. Companies trade and sell Private Information, like that at issue here. Marketing firms use Private Information to target potential customers, and an economy exists related to the value of Private Information. Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PII and PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves.

***Future Cost of Credit and Identify Theft Monitoring Is Reasonable and Necessary***

148. To date, Defendants have ***not*** provided Plaintiff and Class Members with relief for the damages they have suffered because of the Data Breach.

149. The Private Information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information or bank information which cost between $10 and $25.[69] The Private Information accessed and disseminated in this case included "[c]omplete medical records [which] can be particularly valuable to identity thieves, and may go for up to $1,000."[70] The Private Information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

150. Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

151. Given the targeted attack here, the sacrosanct, highly-sensitive Private Information stolen, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, and will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

152. There may be a substantial time lag—years or longer—between when harm occurs and when it is discovered, and when Private Information is stolen and when it is used. According

[69] *See* Jesse Damiani, Your Social Security Number Costs $4 On The Dark Web, New Report Finds, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

[70] What Is the Dark Web?, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited July 25, 2024).

to GAO, which conducted a study regarding data breaches: "[S]tolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[71]

153. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

154. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

***Injunctive Relief Is Necessary to Protect Against Future Data Breaches***

155. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to be in the possession of Defendants, is protected from further breaches by Defendants' implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

[71] Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited July 25, 2024).

## CLASS ACTION ALLEGATIONS

156. Plaintiff brings this nationwide class action on behalf of herself and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

157. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach reported by Defendants in July 2024, including all who were sent a notice of the Data Breach on or around July 3, 2024 (the "Class").

158. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

159. Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

160. Numerosity, Fed. R. Civ. P. 23(a)(1): Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are in excess of 32,000 individuals whose PII and PHI may have been improperly accessed in the Data Breach, and the Class is apparently identifiable within Defendants' records.

161. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class

Members. These include:

a. Whether and to what extent Defendants had a duty to protect the PII and PHI of Plaintiff and Class Members;

b. Whether Defendants had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendants had duties not to use the PII and PHI of Plaintiff and Class Members for non-business purposes;

d. Whether Defendants failed to adequately safeguard the PII and PHI of Plaintiff and Class Members;

e. Whether and when Defendants actually learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII and PHI had been compromised;

g. Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their PHI and PII had been compromised;

h. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

k. Whether Defendants violated the consumer protection statutes invoked herein;

l. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

m. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct; and

n. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

162. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their PII and PHI compromised as a result of the Data Breach, due to Defendants' misfeasance.

163. Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

164. Adequacy of Representation, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

165. Superiority, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and

expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large businesses, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

166. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

167. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, uniform methods of data collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

168. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

169. Unless a Class-wide injunction is issued, Defendants may continue in its failure to properly secure the PII and PHI of Class Members, Defendants may continue to refuse to provide

proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

170. Further, Defendants have acted or refused to act on grounds generally applicable to the Classes and, accordingly, class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

171. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII and PHI;

b. Whether Defendants breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII and PHI;

c. Whether Defendants failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendants made promises to Plaintiff and Class Members, through Defendants' privacy policy or otherwise, regarding handling of Plaintiff's and Class Members' Private Information, and the terms of those promises;

e. Whether Defendants breached promises made in its privacy policy or otherwise to Plaintiff and Class Members;

f. Whether Defendants timely, adequately, and accurately informed Plaintiff and Class Members that their PII and PHI had been compromised;

g. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the of Plaintiff and Class Members; and

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

## CAUSES OF ACTION

## COUNT I: BREACH OF FIDUCIARY DUTY

172. Plaintiff and the Class Members re-allege and incorporate by reference the allegations of paragraphs 1-171 of this Complaint as if they were fully restated herein.

173. At all relevant times, the physicians and other healthcare providers providing medical care and treatment to Defendants' patients were employees and/or agents of Defendants and were acting in the course and scope of said capacity.

174. As a result of the patient-doctor relationship, Defendants have a fiduciary relationship with Plaintiff and Class Members.

175. Because of the special doctor-patient relationship between Defendants and Plaintiff and Class Members, Defendants became a fiduciary by undertaking a guardianship of the Private Information to act primarily for Plaintiff and Class Members, (a) for the safeguarding of Plaintiff's and Class Members' Private Information; (b) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (c) to maintain complete and accurate records of what information (and where) Defendants stored that information.

176. Defendants had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with its patients, in particular, to keep secure their Private Information.

177. Defendants breached their fiduciary duty to Plaintiff and Class Members by failing to safeguard Plaintiff's and Class Members' Private Information.

178. Plaintiff and Class Members did not consent to nor authorize Defendants to release or disclose their Private Information to unauthorized third parties.

179. As a direct and proximate result of Defendants' breach of their fiduciary duty, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their Private Information; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued imminent and continuing risk to their Private Information, which remains in Defendants' possession, and which is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

180. As a direct and proximate result of Defendants' breach of their fiduciary duty, Plaintiff and Class Members are entitled to compensatory, consequential, and general damages suffered as a result of the Data Breach, or in the alternative, nominal damages.

181. Plaintiff and the Class Members also seek punitive damages against Defendants for Defendants' breaches of the fiduciary duties arising from the confidential relationship between physicians and their patients.

182. As shown above, Defendants breached their confidential relationship with Plaintiff and the other Class Members by the reckless manner in which Defendants exposed the Plaintiff's and the Class Members' PII and PHI to exploitation by hackers. As such, Defendants

are liable for compensatory damages.

183. After Defendants knew of the breach, Defendants ***intentionally*** exposed Plaintiff and the Class Members to ***greater harm*** by failing to disclose to Plaintiff and the Class Members for approximately twelve months that hackers had gained access to Plaintiff's and the Class Members' PII and PHI, and, thus, Defendants intentionally violated their duties arising from this confidential relationship.

184. Defendants' willful and intentional decision not to disclose the data breach to its patients deprived Plaintiff and the Class Members of the opportunity to take proactive steps to mitigate the harm of the disclosure of the PII and PHI for months and months.

185. As such, Defendants' actions evidenced willful misconduct, malice, fraud, wantonness, and that entire want of care which would raise the presumption of conscious indifference to consequences, thus making Defendants liable for punitive damages.

186. When Defendants intentionally elected not to disclose the breach to Plaintiff and the Class Members, and thus decided to expose Plaintiff's and the Class Members' most sensitive health information to repeated and continuing exploitation over many additional months, Defendants acted with specific intent to cause harm, which subjects Defendants to punitive damages with no "cap."

## COUNT II:
## NEGLIGENCE

187. Plaintiff and the Class repeat paragraphs 1 – 171 of the Complaint as if fully set forth herein.

188. Plaintiff and Class Members were required to submit their PII and PHI to Defendants in order to receive healthcare services from Defendants.

189. In providing their PII and PHI, Plaintiff and Class Members had a reasonable

expectation that this information would be securely maintained and not easily accessible to, or exfiltrated by, cybercriminals. That reasonable expectation was informed, at least in part, by Defendants' privacy policy.

190. Upon receiving the PII and PHI of Plaintiff and Members of the Class in the ordinary course of its healthcare services business, Defendants owed to Plaintiff and the Class Members a duty of reasonable care in handling, maintaining, storing, and using the same PII and PHI, in securing and protecting the information from being stolen, accessed, and misused by unauthorized parties, and in notifying Plaintiff and Class Members promptly and accurately in the event of a data breach.

191. Defendants' duty of care was imposed by law, assumed by behavior, and/or voluntarily undertaken by Defendants. First, Defendants' duty of care arose as a result of the special fiduciary relationship that existed between Defendants and their patients. Second, Defendants' duty of care arose under HIPAA, which required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. 164.530(c)(1). Third, Defendants' duty of care arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data. Fourth, Defendants' duty of care arose under industry standards providing that companies, like Defendants, must use reasonable care in securing and protecting confidential PII and PHI that it either acquires, maintains, or stores from foreseeable risks, including cyberattacks. Fifth, Defendants' duty of care arose under their privacy policy. Sixth, Defendants' duty of care arose due to the known high frequency of

cyberattacks in the healthcare space, and the fact that the harm to patient victims in a healthcare data breach (here, the Plaintiff and Class Members) exceeds the costs to Defendants of taking reasonable steps to mitigate the risks of a data breach.

192. Defendants owed a duty of care to Plaintiff and the Class Members because Plaintiff and the other Class members compose a well-defined, foreseeable, and probable class of individuals whom Defendants should have been aware could be injured by Defendants' inadequate security protocols. Defendants requested and collected PII and PHI from their patients (including Plaintiff and the other Class Members) for the purpose of providing healthcare services to their patients, and the patients (including Plaintiff and the other Class Members) entrusted their PII and PHI to Defendants for the purpose of obtaining healthcare services from Defendants.

193. Because of these duties, Defendants were required to, among other things, take reasonable steps in accordance with industry standards to: safeguard and prevent disclosure of PII and PHI; design, maintain, and test its data security systems to ensure that these systems were reasonably secure and capable of protecting the PII and PHI of Plaintiff and the Class Members in the event of a foreseeable data breach; implement systems and procedures that would detect a breach of their security systems in a timely manner and to timely act upon security alerts from such systems; notify affected patients promptly and accurately in the event of a data breach; train its data security professionals to ensure their knowledge and competence in safeguarding and protecting highly sensitive PII and PHI.

194. Attendant to Defendants' duties, and Defendants' collection, use, and storage of Plaintiff's and Class Members' PII and PHI, Defendants knew or should have known of their inadequate and unreasonable security practices with regard to their systems and also knew that hackers and thieves routinely attempt to access, steal, and misuse the types of PII and PHI that

Defendants requested and collected from their patients who entrusted Defendants with their data. As such, Defendants knew a breach of their network would cause damage to their patients and Plaintiff and the other Class Members. Thus, Defendants had a duty to act reasonably in protecting the PII and PHI of Plaintiff and Class Members.

195. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and PHI, as alleged and discussed herein, including by:

a. Acting unreasonably in collecting, storing, and maintaining the Private Information and failing to exercise reasonable care in its implementation of their security systems, protocols, and practices in order to sufficiently protect the PII and PHI of Plaintiff and Class Members;

b. Negligently designing and maintaining their data security system in a manner that failed to secure Plaintiff's and Class Members' PII and PHI from unauthorized access;

c. Implementing inadequate security controls;

d. Implementing inadequate security products;

e. Implementing inadequate security policies, including with respect to password protection policies and use of multi-factor authentication for their systems;

f. Failing to properly monitor its data security systems for data security vulnerabilities and risk;

g. Failing to test and assess the adequacy of its data security system;

h. Failing to develop and put into place uniform procedures and data security

protections for its healthcare network;

i. Allocating insufficient funds and resources to the adequate design, operation, maintenance, and updating necessary to meet industry standards for data security protection;

j. Failing to ensure or otherwise require that it was compliant with FTC guidelines for cybersecurity;

k. Failing to ensure or otherwise require that it was adhering to one or more of industry standards for cybersecurity discussed above;

l. Designing its systems without encryption or without adequate encryption;

m. Failing to comply with its own Privacy Policy;

n. Failing to comply with regulations protecting the PII and PHI at issue during the period of the Data Breach;

o. Maintaining Plaintiff's and Class Members' PII and PHI outside its EHR system;

p. Failing to recognize in a timely manner that PII and PHI had been compromised;

q. Waiting for over twelve months before they disclosed the Data Breach; and

r. otherwise negligently and affirmatively mishandling Plaintiff's and Class Members' PII and PHI provided to Defendants, which in turn allowed cybercriminals to access its computer network.

196. Defendants had a duty to promptly and accurately notify Plaintiff and the Class Members of the Data Breach so that, among other things, Plaintiff and Class Members could take appropriate measures to freeze or lock their credit, monitor their account information and credit

reports for fraudulent activity, contact their banks or other financial institutions that issue their credit or debit cards, obtain credit monitoring services, and take other steps to mitigate or ameliorate the damages caused by Defendants' misconduct alleged herein.

197. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members face current and ongoing foreseeable risks, including identity theft, and compensatory damages sustained by Plaintiff and Class Members including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their Private Information; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their Private Information, which remains in Defendants' possession, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

198. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

199. Defendants' negligent conduct is ongoing, in that it still holds the PII and PHI of Plaintiff and Class Members in an unsafe and unsecure manner.

200. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**<u>COUNT III</u>:**
**NEGLIGENCE *PER SE***

201. Plaintiff and the Class repeat and re-allege paragraphs 1 – 171 of the Complaint as if fully set forth herein.

202. Under 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants', of failing to use reasonable measures to protect PII and PHI. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

203. Under HIPAA, Defendants had a duty to act reasonably in collecting, storing, and maintaining the PII and PHI, and to use reasonable security measures. HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. 164.530(c)(1). HIPAA's implementing regulations, HIPAA's Security Rule, and the HHS publications described above also form part of the basis of Defendants' duty in this regard.

204. Defendants violated Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect PII and PHI and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored, and the foreseeable consequences of the Data Breach for companies of Defendants' magnitude, including, specifically, the immense damages that would result to Plaintiff and Class Members from a data breach due to the valuable and sensitive nature of the PII and PHI at issue in this case.

205. Defendants' violations of Section 5 of the FTC Act and HIPAA constitute negligence *per se*.

206. Plaintiff and Class Members are within the class of persons that the FTC Act and HIPAA were intended to protect.

207. The harm that occurred because of the Data Breach is the type of harm the FTC Act and HIPAA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of the failure to employ reasonable data security measures caused the same harm as that suffered by Plaintiff and Members of the Class.

208. Plaintiff and Class Members are entitled to compensatory, consequential, and general damages. Plaintiff and Class Members are also entitled to nominal damages suffered as a result of the Data Breach.

209. Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated and "impacted" individuals whose PII and PHI was accessed during the Data Breach, including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their Private Information; (h) anxiety, annoyance and nuisance, (i) nominal damages, and (j) the future costs of identity theft monitoring.

210. Moreover, Plaintiff's and Class Members' PII and PHI remain at risk, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII and PHI.

211. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit and identity theft monitoring to all Class Members.

**COUNT IV:**
**INVASION OF PRIVACY/INTRUSION UPON SECLUSION**

212. Plaintiff and the Class repeat and re-allege paragraphs 1 – 171 of the Complaint as if fully set forth herein.

213. The State of Georgia recognizes the tort of Intrusion into Seclusion, and has adopted the Restatement (Second) of Torts, which states:

214.

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.
>
> Restatement (Second) of Torts § 652B (1977).

215. Defendants required that Plaintiff and Class Members provide PII and PHI to Defendants in order to receive services from Defendants, and Plaintiff and Class Members wanted and expected their PII and PHI to remain private and non-public.

216. Plaintiff and Class Members had a reasonable and legitimate expectation of privacy in the PII and PHI Defendants collected and stored.

217. Defendants' intentional conduct of collecting, storing, and using Plaintiff's and Class Members' PII and PHI is akin to surveillance of their PII and PHI, which is Private Information.

218. Defendants actively participated in the intrusion into Plaintiff's and Class Members' affairs by negligently maintaining Plaintiff's and Class Members' PII and PHI, by

choosing deficient data security measures despite the known risks of a catastrophic data breach, by failing to protect Plaintiff's and Class Members' Private Information and allowing unauthorized and unknown third parties to access the Private Information of Plaintiff and Class Members, and by failing to promptly and accurately notify Plaintiff and Class Members so that they could take steps to mitigate the harm caused by the Data Breach.

219. The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiff and Class Members is highly offensive to a reasonable person.

220. Defendants invaded Plaintiff's and Class Members' right to privacy and intruded into Plaintiff's and Class Members' private affairs by intentionally misusing and disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

221. The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and Class Members entrusted their Private Information to Defendants as a prerequisite to their use of Defendants' services, but they did so privately with the intention that their Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and Class Members were reasonable in their belief that their Private Information would be kept private and would not be disclosed without their authorization due to Defendants' privacy policy, among other reasons.

222. Defendants' inadequate data security practices and the resulting Data Breach constitute intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

223. Defendants acted with a knowing state of mind when they permitted the Data

Breach to occur because they knew or should have known that their data security practices were inadequate and insufficient.

224. Because Defendants acted with this knowing state of mind, they had notice and knew their inadequate and insufficient data security practices would cause injury and harm to Plaintiff and Class Members.

225. By intentionally failing to keep Plaintiff's and Class Members' Private Information secure, and by intentionally misusing and disclosing Private Information to unauthorized parties for unauthorized use, Defendants unlawfully invaded Plaintiff's and Class Members' privacy and right to seclusion by, *inter alia*: (a) Intentionally and substantially intruding into their private affairs in a manner that would be highly offensive to a reasonable person; (b) Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; (c) Intentionally invading their privacy by improperly using their Private Information properly obtained for another purpose, or disclosing it to unauthorized persons; and (d) Intentionally causing anguish or suffering to Plaintiff and Class Members.

226. The Private Information that was publicized during the Data Breach was highly sensitive, private, and confidential, as it included PII and PHI that is the type of sensitive Private Information that one normally expects will be protected from exposure by the entity charged with safeguarding it. Defendants' intrusions into Plaintiff's and Class Members' seclusion were substantial and would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

227. Defendants' unlawful invasions of privacy damaged Plaintiff and Class Members. As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiff and Class

Members suffered mental distress, and their reasonable expectations of privacy were frustrated and defeated.

228. As a direct and proximate result of Defendants' public disclosure of private facts, Plaintiff and Class Members are at a current and ongoing risk of identity theft and sustained compensatory damages including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) diminution of value of their Private Information; (h) future costs of identity theft monitoring; (i) anxiety, annoyance and nuisance, and (j) the continued risk to their Private Information, which remains in Defendants' possession, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

229. Plaintiff and Class Members are entitled to compensatory, consequential, general and nominal damages suffered as a result of the Data Breach.

230. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT V:
## DECLARATORY AND INJUNCTIVE RELIEF

231. Plaintiff and the Class repeat and re-allege paragraphs 1 – 171 of the Complaint as if fully set forth herein.

232. Plaintiff and Class Members pursue this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

233. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

234. An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class Members' PII and PHI, and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from future data breaches that compromise their PII and PHI. Plaintiff and the Class remain at imminent risk that further compromises of their PII and PHI will occur in the future.

235. The Court should also issue prospective injunctive relief requiring Defendants to employ adequate security practices consistent with law and industry standards to protect Plaintiff's and Class Members' PII and PHI.

236. Defendants still possess the PII and PHI of Plaintiff and the Class.

237. To Plaintiff's knowledge, Defendants have made no announcement that they have changed their data storage or security practices relating to the PII and PHI.

238. To Plaintiff's knowledge, Defendants have made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

239. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Defendants. The risk of

another such breach is real, immediate, and substantial.

240. As described above, actual harm has arisen in the wake of the Data Breach regarding Defendants' obligations and duties of care to provide security measures to Plaintiff and Class Members. Further, Plaintiff and Class members are at risk of additional or further harm due to the exposure of their PII and PHI and Defendants' failure to address the security failings that led to such exposure.

241. There is no reason to believe that Defendants' employee training and security measures are any more adequate now than they were before the breach to meet Defendants' obligations and legal duties.

242. The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another data breach occurs at Defendants, Plaintiff and Class Members will likely continue to be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

243. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendants, thus eliminating the additional injuries that would result to Plaintiff and Class.

244. Plaintiff and Class Members therefore, seek a declaration (1) that Defendants' existing data security measures do not comply with its obligations and duties of care to provide adequate data security, and (2) that to comply with its obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to, the following:

a. Ordering that Defendants engage internal security personnel to conduct testing, including audits on Defendants' systems, on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

c. Ordering that Defendants audit, test, and train its security personnel and employees regarding any new or modified data security policies and procedures;

d. Ordering that Defendants purge, delete, and destroy, in a reasonably secure manner, any Private Information not necessary for its provision of services;

e. Ordering that Defendants conduct regular database scanning and security checks; and

f. Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive personal information, including but not limited to, client personally identifiable information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendants and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiff and her Counsel to represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct

complained of herein pertaining to the misuse and/or disclosure of the PII and PHI of Plaintiff and Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or

iii. requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII and PHI of Plaintiff and Class Members;

v. requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to

promptly correct any problems or issues detected by such third-party security auditors;

vi. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

vii. requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

viii. requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

ix. requiring Defendants to conduct regular database scanning and securing checks;

x. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi. requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii. requiring Defendants to implement a system of tests to assess their

respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiii. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including, but not limited to, actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E. For an award of punitive damages as allowed by law in an amount to be

determined by an enlightened jury;

F. For an award of attorneys' fees, costs, and litigation expenses under O.C.G.A. Section 13-6-11 and as otherwise allowed by law;

G. For prejudgment interest on all amounts awarded; and

H. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

Dated: July 25, 2024

Respectfully submitted,

**WITHERS LAW FIRM PC**

*/s/ Thomas A. Withers, Esq.*
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Email: Twithers@witherslawfirmpc.com

Gary F. Lynch (*pro hac vice* forthcoming)
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
T: (412) 322-9243
gary@lcllp.com

MaryBeth V. Gibson
GA Bar No. 725843
**Gibson Consumer Law Group, LLC**
4279 Roswell Road
Suite 208-108
Atlanta, GA 30342
Telephone: (678) 642-2503
marybeth@gibsonconsumerlawgroup.com

*Attorneys for Plaintiff and the Proposed Class*